UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DDLI LOGISTICS, LLC,

Plaintiff,

v.

METALSA SA de CV,
METALSA STRUCTURAL
PRODUCTS, INC.,

Case No. 20-cv-11872
Honorable Linda V. Parker

Defendants.

_______________________________________/

**OPINION AND ORDER**

This case, filed on July 9, 2020, arises from the alleged unauthorized use of confidential information prepared by Plaintiff DDLI Logistics, LLC, doing business as American Rail Center Logistics ("AR") for Defendants Metalsa S.A. de CV ("MM") and Metalsa Structural Products, Inc.'s ("MSP") (collectively, "Defendants") for their specific business needs. (ECF No. 1.)

In April 2019, AR and MM entered into a Mutual Confidentiality and Non-Use Agreement ("NDA"). (ECF No. 12-1.) In August 2020, AR filed an Amended Complaint alleging: (1) breach of contract claim against MM ("Count One"); unjust enrichment against MSP ("Count Two"); tortious interference with contract against MSP ("Count Three"); and civil conspiracy claims against both Defendants

("Count Four"). (ECF No. 12.) In January 2022, this Court dismissed Count Two, allowing the remaining counts to proceed. (ECF No. 27.)

In September 2024, AR filed a motion for partial summary judgment as to Count One while Defendants filed a motion for summary judgment as to Counts One, Three and Four; both motions were filed pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 76, 78.) AR also filed a motion pursuant to Federal Rule of Civil Procedure 37(e) seeking a finding of spoliation and sanctions, including attorneys' fees associated with the costs of the motion. (ECF No. 77.) AR subsequently filed a motion to strike a new argument contained in Defendants' summary judgment reply brief. (ECF No. 92.)

All four motions are now fully briefed, making them ripe for adjudication. The Court starts by addressing AR's motion for partial summary judgment before addressing Defendants' motion for summary judgment, taking care to evaluate each motion on its own in accordance with Sixth Circuit precedent. As to both motions for summary judgment, the Court finds the facts and legal arguments sufficiently presented in the parties' briefs and hereby dispenses with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

As AR's motion to strike concerns one of the key elements of the claims—namely, whether there was a contract, a key element of Count One—the Court addresses it immediately inside of its merits analysis. *See infra* note 4 and

accompanying text. At the very end, the Court takes up AR's motion for sanctions and a related housekeeping matter concerning relief that Defendants seek.

## I. Legal Standards

The following standards and rules are relevant to the parties' various motions.

### A. Sanctions

In this case, AR moves for sanctions arising from Defendants' spoliation of evidence, namely certain emails, under Federal Rule of Civil Procedure 37. (ECF No. 77.) Rule 37(e) provides that:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > > (C) dismiss the action or enter a default judgment.

"Significantly, subsection (e)(1) does not contain an 'intent' requirement; thus, a party need not act willfully, deliberately, intentionally, or with any objective or subjective bad faith." *Yoe v. Crescent Sock Co.*, No. 1:15-cv-3-SKL, 2017 WL 5479932, at *8 (E.D. Tenn. Nov. 14, 2017). "Under subsection (e)(2), however, before certain sanctions are imposed, the court 'must find that the party that caused the loss acted with the intent to deprive another party of the information's use in the litigation.' Sanctions under (e)(2) include an adverse presumption, an adverse instruction to the jury, or default judgment.'" *Id.* (quoting *Konica Minolta Bus. Sols., U.S.A. v. Lowery Corp.*, No. 15-cv-11254, 2016 WL 4537847, at *3 (E.D. Mich. Aug. 31, 2016)).

**B. Summary Judgment**

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, the rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255.

These standards "do not change" with the filing of cross-motions for summary judgment. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). Courts "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*. (quoting *Taft Broad*., 929 F.2d at 248).

**C. Striking Arguments**

Under the inherent authority of the Court, it has "discretion to strike documents or portions." *Brown v. Genworth Life & Annuity Ins. Co*., No. 3:18-cv-506, 2020 WL 4340539, at *1 (E.D. Tenn. July 28, 2020) (citing *Cincinnati Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg, P.A.*, 377 F. Supp. 3d 859, 864 (S.D. Ohio 2019)). As relevant here, parties forfeit arguments when they do not raise them in their opening briefs. *Golden v. C.I.R.,* 548 F.3d 487, 493 (6th Cir. 2008) (citing *Pagan v. Fruchey*, 492 F. 3d 766, 769 n.1 (6th Cir. 2007)).

## II. Factual Background

**A. Parties and Key Players**

AR is an Ohio company that provides its customers with various supply-chain and logistics services, including transloading, warehousing, trucking, rail transportation, intermodal freight transport, and locating real estate. (ECF No. 76, PageID.1105 (citing ECF No. 76-2, PageID.1131-1132).) AR also provides vehicle

frame handling. (*Id*. (citing ECF No. 76-2, PageID.1133); *see also* ECF No. 76-2, PageID.1132.) MM, incorporated in Mexico, is a global manufacturer and supplier of certain vehicle components, including vehicle frames. (ECF No. 76 at 1105 (citing 76-3, PageID.1156); ECF No. 83, PageID.1945 (citing ECF No. 78-4, PageID.1494); ECF No. 78-2, PageID.1477.) Both parties refer to MSP as an affiliate of MM for purposes of the NDA and otherwise in making their arguments, so the Court will treat this as undisputed for purposes of both summary judgment motions. (*See, e.g.,* ECF No. 76, PageID.1110; ECF No. 78, PageID.1147; ECF No. 84, PageID.2089; ECF No. 78, PageID.1466.) MSP is based in the United States. (ECF No. 78-16, PageID.1573; *accord* ECF No. 76-5, PageID.1170-72.)

Maumee Assembly and Stamping (hereinafter "MAS"), which is not a party to this action but is the entity whose warehouse location and services remain at the heart of this dispute, is a company based in Maumee, Ohio. (ECF No. 83-7, PageID.2009.) MAS provides stamping, assembly, and tool and die services. (*Id.*, PageID.2006; *accord* ECF No. 78-5, PageID.1503.) At least for the purposes of this case, the parties agree that MAS offered warehouse storage and material handling services as well. (ECF No. 83, PageID.1950 (citing ECF No. 78-5, PageID.1503-04; ECF No. 76-2, PageID.1141; ECF No. 76-13, PageID.1260 (suggesting its "main business is not to do logistics or rent [buildings] . . . but to stamp parts").).

**B. Defendants' Prior Connections with MAS**

In 2015, well before the events that gave rise to litigation occurred, MM toured MAS' Maumee, Ohio plant regarding a potential purchase of the site. (ECF No. 76-3, Page.ID 1156.) MM has produced a copy of its 2015 "Logistics Plant Visit Report." (ECF No. 78-21) (hereinafter the "MM 2015 Report.") To the extent the details of this report are relevant, the Court finds that the better practice is to provide and address those details in its analysis rather than here.

Separately, between December 14, 2018 and February 20, 2019, MAS provided MSP with stamping services to assist with the work that MSP does in connection with the Jeep Gladiator program (hereinafter the "JT Program"). (ECF No. 78-2, PageID.1479 (generally discussing MSP's work for the JT Program and noting it makes the frames in Owensboro, Kentucky before shipping them to an assembly plant in Toledo, Ohio); ECF No. 76-5, PageID.1186 (noting that MAS, since 2018, provided stamping services to MSP in Owensboro); ECF No. 78-16, PageID.1575 (noting the first time MAS performed services for MSP was December 14, 2018 and the last time was February 20, 2019.) For those unfamiliar with this term, stamping involves "tak[ing] a piece of metal" and "form[ing] it in a die that molds it and cuts it," a process that creates "underbody vehicle part[s]." (ECF No. 78-16, PageID.1575.) Presumably, the reason MSP was involved with the JT Program in the first place was that it had received a contract from Stellantis,

formerly known as "Fiat Chrysler America" or "FCA," to manufacture the frames for assembly at Stellantis' facility in Toledo. (ECF No. 78-2, PageID.1479 (noting that MSP sends the frames to the Stellantis' assembly plant in Toledo); (ECF No. 76-5, PageID.1170 (noting, as an aside, that the name changed from FCA to Stellantis.)

**C. The JL Program**

In 2018, FCA, now Stellantis, awarded MM a five-year contract to become the supplier of vehicle frames in connection with Jeep's Wrangler program (the "JL Program").[1] (ECF No. 76-5, PageID.1171; ECF No.78-4, PageID.1493; ECF No. 78-18, PageID.1588; ECF No. 76-16, PageID.1275.) As part of that program, MM would manufacture the frames for the JL program in Mexico and have them shipped to the United States. (ECF No. 78-18, PageID.1588.) On average, MM ships approximately 80,000 JL frames per year to the Stellantis facility in Toledo. (*Id.*; ECF No. 76-5, PageID.1170.) As relevant here, MM sought out businesses such as AR that could facilitate finding a storage facility (and later, a materials handler) for those frames so that they could be stored (and unloaded and reloaded) as needed before the frames went to the Stellantis facility in Toledo. (ECF No. 76-5, PageID.1170-71.)

---

[1]Although the parties do not elaborate and it ultimately is immaterial, the Court presumes that it was Stellantis that had the contract with Jeep for both the JT and JL Programs and that Stellantis delegated the vehicle frame manufacturing part of that contract to MSP and MM respectively.

Prior to reaching out to these companies, however, MM contacted Norfolk Southern (hereinafter "NS"), its railroad supplier of roughly 10 years and the company responsible for shipping the frames from MM's Mexico location to the United States for the JL Program, to see if NS had a subcontractor that could provide these services. (*Id*., PageID.1177.) To that end, MM initiated communications with NS sometime near the end of 2018, likely September or October of 2018. (*Id*., PageID.1178.) But NS failed to identify "acceptable options." (*Id*., PageID.1178-79.)

In December 2018, MM issued a request for quote (hereinafter, the "RFQ") to multiple warehouse service providers in Ohio, including AR. (ECF No. 76-6; ECF No. 78-6.) According to Ms. Nelida Jasso, an MM employee in charge of the MM's search for providers, MM did so not only because NS' efforts proved fruitless, but also because the scope of work changed: there was now an added requirement that MM "find a supplier who can do the whole service, warehouse plus material handling." (ECF No. 76-5, PageID.1179.)

MM first sent the RFQ to ThyssenKrupp. (ECF No. 76-5, PageID.1166.) Then, on December 28, 2019, it sent the RFQ to AR. (*Id*.; ECF No. 76-6, PageID.1190.) Subsequently, it sent the RFQ to Midwest Terminals. (ECF No. 76-5, PageID.1166.)

The scope of work portion of the RFQ stated:

> We need you to quote the storing and frames handling for our pre-sequence center in Toledo, it includes also the downloading the frames from rails cars and uploading into a truck to be delivered to our customer . . . . We will evaluate the design and cost after a revision with our final Customer and his Approval we will decide a release of a PO. Please let us know if more information about specifications is needed.

(ECF No. 76-6, PageID.1196; ECF No. 78-6, PageID.1515.) In the RFQ, MM provided a flowchart—which the Court need not reproduce in full at this juncture—reflecting its logistics plan for the JL Program frames, including rail transportation provided (by NS) and trucking to its customer, Stellantis (provided by Piston). (ECF No. 76-6, PageID.1193; ECF No. 78-6, PageID.1512; *see also* ECF No. 78, PageID.1457 (citing ECF No. 78-6).) In addition, although not expressly indicated in the RFQ, MM had a September 15, 2019 deadline (also called the "launch date") by which it needed to have a facility ready so that it could start shipping the frames to Stellantis in fulfillment of its obligations. (ECF No. 83-2, PageID.1975; ECF No. 78-5, PageID.1498; ECF No. 76-5, PageID.1185.) Although the Court is uncertain as to when AR first became aware of this deadline, the Court is certain that it knew about the deadline as of May 5, 2019. (ECF No. 76-11 (a letter from the founder of AR noting the September 15 deadline).)

MM did not visit the warehouse proposed by ThyssenKrupp due to its high pricing. (ECF No. 76-5, PageID.1167-68.) MM, therefore, focused on the proposals submitted by Midwest Terminals and AR. (*Id.*) MM started to work

with Midwest Terminals in December 2018, around the same time it began to work with AR to secure a facility. (ECF No. 76-5, PageID.1168.) In February or March of 2019, MM determined that the proposal submitted by Midwest Terminal would not be acceptable. (ECF No. 76-5, PageID.1169.)

On or around January 2019, AR responded to the RFQ with proposed pricing for warehousing services and a plan to provide the services in a warehouse to be built on its property. (ECF No. 76-2, PageID.1138-39.) In April 2019, that plan, informally referred to in the emails and exhibits the parties attach as Plan A, started to (and would eventually) fall through due to a floodplain situation that would preclude construction of the warehouse by the September deadline. (ECF No. 76-9, PageID.1215; ECF No. 76-2, PageID.1147; ECF No. 76-17, PageID.1278.)

**D. The NDA**

That same month, MM and AR signed the NDA, a five-year contract, effective January 30, 2019, which restricted the use or disclosure of "Confidential Information." (ECF No. 12-1.) As the Court addresses the NDA's key restrictions, namely provisions 1.4, 2.2, 2.3, 5, and 6 in its analysis, it will, at this juncture, merely identify some key terms useful for understanding the substance in dispute.

To start, the term "Affiliate" means:

> [W]ith respect to either Party, a corporation, limited liability company, partnership or individual, including but not limited to, all of its employees, directors and officers, directly or indirectly controlling, controlled by or under

> direct or indirect common control of that Party. A Party is deemed to control if such Party possesses directly or indirectly, the power to direct or cause direction of the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

(*Id*., § 1.1.) As noted earlier, both parties refer to MSP as an Affiliate of MM in making their arguments, so the Court will treat this as undisputed for purposes of both summary judgment motions. The term "Affiliate Discloser" means:

> An affiliate of either of the parties' hereto which discloses Confidential Information to the other Party or to an Affiliate Receiver (as defined below). Any Affiliate Discloser may disclose Confidential Information to a Party or to an Affiliate Receiver hereunder and such disclosure shall be deemed to be a disclosure of Confidential Information of a Disclosing Party (as defined below)

(*Id*., § 1.2.) The term "Affiliate Receiver" means:

> An affiliate of either of the parties' hereto which receives Confidential Information from the other Party or from an Affiliate Discloser. Any Affiliate Receiver may receive Confidential Information from a Party or from an Affiliate Discloser hereunder and such disclosure shall be deemed to be a receipt of Confidential Information of a Receiving Party (as defined below)

(*Id*., § 1.3.) The term "Disclosing Party" means "either Party under this Agreement that discloses Confidential Information to the Receiving Party or to an Affiliate Receiver (as defined below)." (*Id*., § 1.5.)

The term "Disclosure Purpose" means "the technical and business interest evaluation and analysis of the Confidential Information by the Receiving Party or the Affiliate Receiver in connection with the Purpose. (*Id*., § 1.6.)

The term "Purpose" means "the potential purchase and sale of product(s) or the rendering of services, the discussion and investigation of the technical and/or business details of products and/or services between (a) the Parties, (b) Affiliates of the Parties or (c) one of the Parties and an Affiliate of the other Party." (*Id*., § 1.7)

The term "Receiving Party" refers to "either Party under this Agreement that receives Confidential Information from the Disclosing Party or from an Affiliate Discloser." (*Id*., § 1.8.)

**E. AR Produces an Alternative Plan**

On April 30, 2019, an AR representative sent via email to Metalsa's Toledo Warehouse team a copy of the "redundancy plan," also referred to as "Plan B." (ECF No. 76-9, PageID.1215; ECF No. 76-2, PageID.1147.) This plan suggested two suitable locations—a facility in Walbridge, Ohio operated by AR and a facility in Maumee, Ohio operated by MAS. (*See generally* ECF No. 76-9.) For purposes of simplicity and consistency, the Court will hereafter refer to the plan as a whole as "Plan B" and the specific portion of Plan B related to the facility in Maumee as the "AR/MAS Plan." (ECF No. 76-9, PageID.1217-1227 (Plan B); ECF No. 76-9, PageID.1217-24 (AR/MAS Plan).)

On the prefatory page to Plan B, there is a designation that there is: "Confidential Information to follow in accordance to Metalsa and American Rail Center Logistics Non-Disclosure Agreement." (ECF No. 76-9, PageID.1217.) In the subsequent pages, there are details about the two sites. (ECF No. 76-9, PageID.1218-1227.) In relevant part, the AR/MAS Plan contained information regarding how MAS operates, the Maumee's facility's characteristics, and what types of services MAS can provide. (ECF No. 76-9, PageID.1217-24.) As suggested earlier, the AR/MAS Plan is at the heart of the parties' dispute today.

**F. AR, at MM's Request, Contacts NS**

On May 7, 2019, AR, at MM's request, emailed NS (and carbon copied certain MM employees), advising them of the floodplain dilemma with Plan A and inquiring into whether NS "[w]ould know of any available building in the Toledo area for offloading and frame distribution for Metalsa" or if NS would otherwise "foresee[] any problems servicing the [MAS] site via rail" that AR identified as an alternative, i.e., the AR/MAS Plan. (ECF No. 76-17, PageID.1278; ECF No. 76-2, PageID.1140-42.)

**G. The Deal AR Secured for MM With MAS Falls Through**

As detailed below, the parties vehemently dispute the reason(s) that MM's deal with MAS fell through.

According to MM's internal emails, the AR/MAS Plan fell apart when AR "could not reach a lease agreement with the owner" since MAS "had plans with another customer." (ECF No. 84-15, PageID.2257.)[2] Those same emails suggest that AR, at some point, demanded a clause that would bind MM and would "apply not only for the JL project but for all frames coming from Metalsa to FCA Toledo." (ECF No. 84-18, PageID.2272) (hereinafter, the "Exclusivity Clause.")

According to Matt Jacobs, the founder of AR, the deal with MAS fell through because Ms. Jasso with whom he corresponded in connection with the JL program, utilized a "negotiating tactic" to "get a reaction as far as [AR's] price" by "only g[iving] [AR] three days from the date of Plan B pricing negotiation," requiring AR to conclude negotiations with [MAS] by Friday, May 10th, 2019 with no price increases." (ECF No. 76-2, PageID.1149.) Otherwise, according to Mr. Jacobs, AR "would have closed this deal, plain and simple." (*Id.*) AR also points to deposition testimony from Sergio Garza, a MM employee working alongside Ms. Jasso at the time, who indicated—in response to a question whether Ms. Jasso had any discussions with him regarding AR's proposal of ARC—that he "very, very briefly" recalls AR's proposal of the MAS facility, noting that: "I don't know

[2]This email correspondence was translated from Spanish using Google translate by counsel. This was not the only email that was translated by counsel. The parties do not dispute the translation of this email, or any other, at any point in their briefs, so the Court relies on counsel's translations to craft its factual background.

how to say it. Like it was an option but was shut down immediately." (ECF No. 76-7, PageID.1205.)

**H. MM Explores Other Options**

Thereafter, in approximately June and July of 2019, MM reached out to Colliers, Newmark, and Plante Moran to see if any of those companies could provide a suitable location. (ECF No.78-5, PageID.1499); ECF No. 76-5, PageID.1183.) By that point, in Ms. Jasso's view, AR "failed and [MM] [was] in a hurry," a reference to the September deadline. (ECF No. 76-5, PageID.1183.) Ms. Jasso testified that those other companies received "the same RFQ" relative to what AR originally received, with the caveat that MM "[p]robably . . . add[ed] some other information, but it was basically the same scope of work." (ECF No. 76-5, PageID.1185.) She further testified that the other companies "provide[d] many options but they were not all viable because of the height of the building." (ECF No.78-5, PageID.1499.) She also testified that MM met "with Colliers by phone and with some others" and they "offer[ed] [MM] options, like three or four other warehouses," but "none of them were meeting the height . . . [MM] needed." (*Id*., PageID.1500.)

At the end of July 2019, MM met with NS at its facilities in Toledo "due to the situation [MM] had with IRM," another supplier who indicated "that renting its warehouse is no longer an option for Metalsa." (ECF No. 76-13, PageID.1261-62;

*see also* ECF No. 78-5, PageID.1500; ECF No. 84-15, PageID.2257.) From that meeting, MM learned about three scenarios in which NS could provide daily transportation. (ECF No. 76-13, PageID.1262.) The first involved using NS' "Summer Yard," an option "offered to [MM] by AR" which "c[ould] only be operated by AR and not another provider, due to the contract that [AR] has with NS for the use of the tracks." (*Id.*) The second involved using NS' "Airline Yard," an option that allowed MM to use any provider. (*Id.*) Finally, MM revisited the idea of using the MAS facility in Maumee. (*Id.*) In relevant part, Ms. Jasso's email reads: "Maumee Warehouse – NS got us the contact in Maumee, this warehouse has tracks, tomorrow [August 1, 2019] we will visit them to see if they are an option or not." (*Id.*)

According to an internal email from the evening of August 1, 2019 sent by Ms. Jasso to her "[t]eam," she indicates her team visited "2 possible crossdocks and 1 possible long-term option." (*Id.*, PageID.1260.) She goes on to discuss the "Ann Arbor Yard," the "Watco Terminal," a site in Port Monroe, as well as the MAS facility. (*Id.*) In relevant part, she writes that:

> On yesterday's call we discussed that today we would be visiting a [site] that NS recommended[:] [MAS]. This . . . was an option that [AR] considered 3 months ago when its building permits were suspended, what [AR] commented at the time was that it could not reach a lease agreement with the owner . . . since Maumee had plans with another customer.

(*Id.*) That same evening, Ms. Jasso wrote to NS representatives, indicating her team "met with Phil from Maumee" earlier that day and that the "[l]ocation fits perfect with our requirement[s]." (ECF No. 84-16, PageID.2263); *accord* (ECF No. 76-13, PageID.1261 (in a message to her team also dated August 1, 2019, Ms. Jasso writes, "[i]n summary, [the MAS building[3]] is a very good option, it meets everything we are requiring.")

On August 2, 2019, Mr. Jacobs wrote to Ms. Jasso, advising her that he has "receiv[ed] [a] huge amount of emails and voice calls from real estate agents," presumably from entities such as Colliers and Newmark, "asking if [AR] has warehouse space and rail availability" for the JL Program. (ECF No. 84-18, PageID.2273.) He writes that AR "has already spent over $30,000 for the airline project," presumably a reference to the Airline Yard plan noted earlier, "regarding legal and survey engineering expenses[.]" (*Id.*) AR, he asserts, "made these expenditures" in "good faith" so that MM could "secure their supply chain for FCA, but [MM] walked away from this development looking for other options." (*Id.*) "Respectfully," he concludes, "[AR] is needing reassurance from [MM] that we are a partner and not just a number investing a supply chain that will not come

---

[3]The Court notes that during Mr. Garza's deposition, counsel addresses a translation issue wherein the Spanish word "nave" was translated as "ship," when really it means "building." (ECF No. 76-6, PageID.1205.) Thus, because the word "ship" appears in Google-translated version of the email, the Court construes it to mean building in this context, as it makes the most sense in light of the record.

to fruition," noting that his "team is continuing to secure the supply chain for September 15" and "working hard to achieve pricing back to your team." (*Id.*)

Ms. Jasso responded that, as to the Airline yard proposal, MM, in the prior week, "couldn't g[e]t a final agreement," but instead "got to an impasse on some clauses." (ECF No. 84-18, PageID.2272.) She specifically characterizes AR's "legal" team's most recent email at the time as "very imperative" regarding the inclusion of its Exclusivity Clause. (*Id.*) As such, she says, MM "did re-activate," at that time, "the search with 2 of our real estate brokers in Ohio and Michigan." (*Id.*) She continues by advising Mr. Jacobs that MM "still want[s] to choose [AR] to operate this project, but the [Summer Yard option] is not yet approved from our operation team" in light of the many risks associated with the project. (*Id.*) "Nonetheless," she writes, "the Logistics team still want[s] to consider it[;] they are preparing a presentation for the rest of Metalsa's team and [will] get a decision by end of next week and that is why I asked you to prepar[e] the quote for this operation." (*Id.*) "However," she continues, "if the rest of the team does not give us the green light, Metalsa will have to find other options." (*Id.*)

On or around August 19, 2019, MM consummated a deal with MAS to use its facility. (ECF No. 78-5, PageID.1504.) On March 10, 2020, AR sent a demand letter, describing the behavior it construed to be a violation of the NDA and

attaching the complaint it intended to file with this Court. (ECF No. 77-2.) This lawsuit followed. (ECF No. 1.)

## III. Applicable Law and Analysis – AR's Motion for Partial Summary Judgment

### A. Breach of Contract Against MM

In Count I of its Amended Complaint, AR alleges that MM breached the NDA by using Confidential Information disclosed by AR to secure a third-party warehouse that fit MM's needs for purposes of the JL program. Under Michigan law, a plaintiff alleging breach of contract must show: (1) the terms of a contract, (2) breach of those terms by the defendant, and (3) injury to the plaintiff from the breach. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003). Aside from the meritless argument that the NDA is void, *see infra* Section III.A.I, and a belated argument that is waived, which is the subject of the motion to strike, *see infra id*., the parties do not dispute that the NDA constituted a contract between MM and AR. As such, the Court focuses primarily on the alleged breach and damages. *See infra* Sections III.A.II and III.A.III.

#### I. The NDA Is a Valid Contract and Is Not Void

According to MM, the NDA is void because AR did not sign off with their registered name, i.e., the name on file with the State of Michigan, but rather, with their assumed name—"American Rail Center Logistics, an Ohio Corporation"—in

violation of Mich. Comp. Laws § 445.1. (ECF No. 12-1.) In relevant part, the statute MM recites reads as follows:

> (1) A *person* shall not carry on, conduct, or transact business in this state under an assumed name, or under a designation, name, or style other than the real name of the person owning, conducting, or transacting that business, unless the person files in duplicate in the office of the *clerk of the county or counties* in which the person owns, conducts, or transacts, or intends to own, conduct, or transact, business, or maintains an office or place of business, a certificate on a form furnished by the *county clerk* setting forth the name under which the business owned is, or is to be, conducted or transacted, and the true or real full name and address of the person owning, conducting, or transacting the business. At the time of filing the certificate, the person shall pay the clerk a filing fee of $6.00. The certificate shall be executed and duly acknowledged by the person owning, conducting, or intending to conduct the business.

§ 445.1(1) (emphases added). The statute defines "Person" as: "1 or more individuals, partnerships, trusts, fiduciaries, or other entities capable of contracting, except corporations and limited partnerships." § 445.1(4)(a). For "persons" in violation of this statute, punishment may include a fine, imprisonment, as well as a bar against bringing lawsuits until the defect is cured. § 445.5(5).

The proper interpretation of a statute is a question of law. *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012) (citing *Eggleston v. Bio-Med Applications of Detroit, Inc.*, 658 N.W. 2d 139, 141 (Mich. 2003)). MM's argument depends on the assumption that this statute applies. It plainly does not.

This is because "American Rail Center Logistics," per the NDA, is a corporation and the entity contracting with MM, rendering it excluded from the definition of "person." (ECF No. 12-1); *see* § 445.1(4)(a).

If this conclusion was not already apparent by the fact that the statute's punishment includes imprisonment, MM should also have taken care to note one other important detail: corporations must register with the state, *not the local county clerk*. *See* § 450.1131 (noting that corporate documents required by law to be filed are to be delivered to the administrator); § 450.1105(a) (noting that the administrator refers to the chief officer of the department authorized to act); § 450.1106(2) (noting the department refers to the Michigan's Department of Licensing and Regulatory Affairs); § 450.1131 (noting that articles of incorporation are required to be filed for a corporation to be deemed to exist under the law); *see also* § 450.4206 (requiring a limited liability company's initial papers be filed with the state). Plainly, then, any penalties associated with mistakes made during the corporation registration process would fall under a different set of statutes altogether, rendering § 445.1(1) altogether irrelevant here.

While the Court is on this topic, it takes a moment to address AR's motion to strike one of MM's arguments. (ECF No. 92.) Specifically, this motion concerns MM's argument in its merits reply brief that: "DDLI's attempt to create 'American Center Logistics' as an assumed name does not allow enforcement of the NDA in

the name of 'American Rail Center Logistics', an Ohio Corporation." (ECF No. 85, PageID.2366.)[4] The rationale that MM provides for this assertion is that Mich. Comp. Law § 450.4204 "prohibits an LLC," such as DDLI, "from registering a 'corporation' as its assumed name." (*Id.*)

However, as just explained, MM's initial opening brief cited to a different set of statutes, albeit incorrect, and Mich. Comp. Law § 450.4204 was not among them. (ECF No. 78, PageID.1468-69; *see also* ECF No. 83, PageID.1966-67 (not mentioning it in their opposition brief to AR's motion for partial summary judgment either). As such, this argument is waived. *Golden,* 548 F.3d at 493 (6th Cir. 2008) (citation omitted). In any event, it is evident that, wherever MM thinks its argument is headed, it has no merit. *See Duray Dev., LLC v. Perrin*, 792 N.W.2d 749, 756 (Mich. Ct. App. 2010) ("Where a body assumes to be a corporation and acts under a particular name, a third party dealing with it under such assumed name is estopped to deny its corporate existence." (quoting *Estey Mfg. Co. v. Runnels*, 20 N.W. 823, 824 (Mich. 1884)). Accordingly, the Court will, while perhaps unnecessary as a general matter of course, grant the motion to strike pursuant to its inherent authority. *See Brown*, 2020 WL 4340539, at *1 (citation omitted).

[4]Although the motion to strike concerns an argument made in Defendants' reply brief in support of their summary judgment motion, and this section is concerned with Plaintiff's motion for partial summary judgment, the Court addresses it here for ease of reading. Indeed, this issue is a matter of law, rather than fact, neither party is advantaged or disadvantaged by the Court resolving it in this manner.

## II. Whether There Was a Breach Is for the Jury

The first dispute in the breach analysis is whether, under the NDA, the information disclosed by AR can be characterized as Confidential Information. If so, the second dispute is whether those disclosures fall within any of the NDA's four exclusions. Finally, the parties dispute whether Confidential Information was used to procure the MAS facility in violation of the NDA. The Court will address each dispute in turn.

### A. Was There Confidential Information Disclosed?

In Michigan, courts "enforce unambiguous contract terms." *Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) (citing *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003)). Courts "enforce contracts according to their terms, as a corollary the parties' liberty of contracting." *Id*. (citing *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 21 (Mich. 2005)). Courts "give words their plain and ordinary meanings." *Id*. (citing *Wilkie v. Auto-Owners Ins. Co*., 664 N.W.2d 776, 780 (Mich. 2003)). "An unambiguous contractual provision reflects the parties' intent as a matter of law . . . ." *Id*. (citing *Nagel Precision, Inc*., 666 N.W.2d at 259). "[T]he cardinal rule" in contract interpretation is to determine the parties' intent. *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (citations omitted).

As noted, the parties' first dispute centers on whether the information disclosed by AR constitutes "Confidential Information" under the NDA. In relevant part, the NDA reads:

> "Confidential Information" means any and all knowledge, data or information related to the property and business of the Disclosing Party (as defined below) in any and all tangible or intangible forms, whether oral, written, photographic, electronic or in any other medium, whether patentable or not, not generally known in the industry in which each Party hereto is engaged, which is disclosed to the other Receiving Party (as defined below) or which the Receiving Party learns or is privy to as a consequence of its exposure to Confidential Information or property of the Disclosing Party, regardless of form and whether or not marked as proprietary or confidential, at any time on or subsequent to the date of this Agreement, which information is identified as confidential at the time of disclosure or that a reasonable person would consider, from the nature of the information and circumstances of disclosure, is confidential to the Disclosing Party, including but not limited to:
>
> (a) any proprietary information, trade secrets, other intellectual property, systems, data or knowledge regarding property, equipment, processes, analyses, methodology, formulae, specifications, compounds, manufacturing methods, control charts, computations, studies or physical samples of goods or products provided by the Disclosing Party to the Receiving Party, and analyses, computations, memoranda, reports or other written documents prepared by the Receiving Party or any of its affiliates and derived from the Disclosing Party's Confidential Information . . . .

(ECF No. 12-1, §1.4.) According to AR, its "proposal regarding [MAS'] capabilities to handle the JL program" qualifies as Confidential Information under the NDA. (ECF No. 76, PageID.1115 (citing No. 76-9, PageID.1217-24) (referencing the AR/MAS Plan).) According to MM, this interpretation is wrong because Confidential Information is limited to information "related to the property and business of the Disclosing Party" that is "not generally known in the industry." (ECF No. 83, PageID.1955-56.) The Court fully disagrees with MM.

To the extent MM argues that the information AR disclosed, namely, the suitability of the MAS warehouse for the JL Program—which was disclosed via the AR/MAS Plan—does not relate to the property or business of AR, the Court disagrees for the following reasons. While the details considered individually—such as the capabilities of the MAS facility, its location, and its rail spurs—may all be public knowledge, the AR/MAS Plan constitutes AR's "analysis that the [MAS] location satisfied [MM's] needs for the JL program," information that the NDA specifically protects. (*See* ECF No. 12-1 (noting Confidential Information includes "analyses" provided by AR).) Indeed, a contrary result would require accepting a logical fallacy: "that the whole is nothing more than the sum of its parts." *Rosen v. Unilever U.S., Inc.*, No. C 09-02563 JW, 2010 WL 4807100, at *5 (N.D. Cal. May 3, 2010) (explaining that the "reasoning is fallacious because things joined together may have different properties as a whole than they do separately.") Because the

parties expressly designated this information as Confidential Information, the Court is constrained to conclude that it represents the parties' intent in forming the contract, which is the cardinal rule by which the Court must abide. *Holland*, 791 N.W.2d at 727.

Supporting this result is that the NDA also protects information that "a reasonable person would consider, from the nature of the information and circumstances of disclosure, to be confidential." (ECF No. 12-1, §1.4.) In a context all but identical to this one, but for the lack of a trade secrets claim, courts have held that such information constitutes protected information. *See e.g., Am. Furukawa, Inc. v. Hossain*, No. 14-13633, 2017 WL 4324945, at *5 (E.D. Mich. Sept. 29, 2017) ("Knowledge of vendors, vendor capabilities, and pricing can be a trade secret so long as the information is not readily attainable." (citing *Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc.*, 680 F. Supp. 2d 830, 843 (E.D. Mich. 2010)); *Union Home Mortg. Corp. v. Frateli*, No. 1:23-cv-857, 2025 WL 639315, at *6 (N.D. Ohio Feb. 27, 2025) (collecting cases applying Ohio trade secret law holding the same). Indeed, a reasonable person would construe this information as related to the property or business of AR, lest Wall Street stocks analysts preparing detailed reports on publicly traded companies worry for their ability to sell their thoughtful analyses for a profit, that is, their jobs. As such, the Court has no doubt

the suitability of the MAS warehouse for the JL Program, which was disclosed via the AR/MAS Plan, relates to the property or business of AR.

The Court further disagrees with MM that there is a genuine issue of material fact as to whether the suitability of the MAS for the JL Program was generally known. To start, the Court agrees with AR's assessment that MM's selection of emails fail to satisfy MM's burden to come forth with opposing evidence evincing a genuine dispute, as the emails MM cites either followed the disclosure of the AR/MAS Plan or refer to events that occurred at some indefinite time in the past. (*See, e.g.*, ECF No. 83-5, PageID.1987 (an email, dated August 29, 2019, from the president of another warehouse provider addressed to Ms. Jasso, offering its firm's material handling services following MM's selection of the MAS facility, a location which the president notes "was one of the locations [that warehouse provider] w[as] going to tell [MM's] team about" and which the president had "familiar[ity]" with dating back to when "it was the Ford Stamping plant."; ECF No. 83-6, PageID.1991-92 (an email from a Plante Moran representative, dated August 1, 2019, noting that he had learned that MM was meeting with MAS that same day and opining that, based on his "previous" walk-through of the facility with MM, an event for which he provides no specific date or general timeframe, MAS "may be a good opportunity.").

The Court is similarly unpersuaded by MM's contortion of Mr. Jacobs' deposition testimony to create a genuine issue of material fact as to whether the contents of the AR/MAS Plan were generally known. According to MM, one can infer general knowledge from the fact that: "[w]hen [AR] considered the former Ford plant, it didn't know MAS was the owner, so it emailed a local real estate broker, who contacted MAS." (ECF No. 83, PageID.1957 (citing ECF No. 78-3, PageID.1489 and ECF No. 78-22, PageID.1634).)

Not so. This argument not only ignores several important details, but it also misstates his testimony. In February 2019, the timeframe to which MM refers but does not identify in its brief, Mr. Jacobs reached out to another real estate broker (on condition of confidentiality) for assistance with the search for a facility for MM because he had a heart attack, not because he did not know that MAS was the owner. (ECF No. 76-10, PageID.1237 (testifying that he reached out to the broker because he "was recovering").) Moreover, he specifically testified that he asked that real estate broker to reach out to the Maumee Stamping Plant to see if they have warehouse space. (ECF No. 78-3, PageID.1489.) Despite these facts, MM seems to insist that Mr. Jacobs did not know that the owner of the MAS facility was MAS because, in his email request to the broker, he referred to the facility as the "*Ford* Maumee Stamping Plant." (*Id*. (emphasis added); ECF No. 78-22, PageID.1635 (Mr. Jacobs' email to the broker).) Such an argument not only makes

no sense, but it also ignores Mr. Jacobs' explanation: that he presented the information in those terms because he was "sure [that] [was] how [the real estate agent] remembered it"—a statement which, for the record, is one that MM undoubtedly hopes the Court will absorb without context as evidence of general knowledge. (ECF No. 78-3, PageID.1489.)

The Court further agrees with AR that MM cannot seriously rely on what NS claimed to have known about the MAS facility, particularly insofar as MM suggests that "[i]t was [NS] who proposed MAS' facility as an option in July 2019 and provided MAS' contact information." (ECF No. 83, PageID.1958 (citing ECF No. 78-5, PageID.1498-1500).) After all, AR informed NS about the possible suitability of the MAS facility back in May 2019 at MM's request. *See supra* Section II.F; (*accord* ECF No. 76-17, PageID.1278.) To the extent that MM seeks to use NS' prior servicing of the MAS' railroad tracks at the MAS facility to support its position, the legal reality remains unchanged here; even if the servicing occurred well before 2019, the MAS' railroad tracks were just one part of the AR/MAS Plan and otherwise do not bear on the key point here: that the Confidential Information is the suitability of the MAS facility for the JL Program, not just its physical location. Similarly, while MM's own tour in 2015 of the MAS facility may bear on an exception to be discussed later, it has no ability, standing alone, to show that the AR/MAS Plan was generally known.

Finally, the Court is not satisfied that the webpages that MM provides from MAS' website create a genuine issue of material fact as to general knowledge. (ECF No. 83-7.) For starters, MM provides just a screenshot of the 2011 website, and it only purports to display an "actual video of various processes at MAS." (*Id.*, PageID.1998). However, MM makes no effort to explain which processes the videos depict, nor why the videos cannot (or could not) be obtained for the Court's review. In fact, MM does not even point out that the videos appear on the website in (any of) their briefs but rather leaves it to the Court to discern for itself their significance. This evidence, then, provides just a scintilla of evidence, at best, which is insufficient to withstand summary judgment. *See Liberty Lobby*, 477 U.S. at 252.

Even when considering MM's screenshots of the 2012 and 2015 MAS websites, this result does not change. Other than a mission statement and vision statement which provide no material details, there is only the "quick facts" sections that warrant consideration. For both 2012 and 2015, the quick facts sections contain the same six details: that MAS is "private/family owned," that it has a "9001:2008" certification, that it is "strategically located on major highways, railways, and ports," that it has "2 in-plant spurs and 6 truck wells," that it has "800,000 square ft. under one roof," and "76 acres fenced and secured." (ECF No. 83-7, PageID.1999-2004.) Unlike the AR/MAS Plan, nowhere in these quick facts

sections is there mention of, among other things, the extent of office or storage space available or the heights of the ceilings. (*Compare* ECF No. 76-9, PageID.1220-22 *with* ECF No. 83-7, PageID.1999-2004.) The Court could go on with the list, but the point remains that these screenshots fall well short of establishing that MM's conclusion that: "[a]ll information disclosed by [AR] related to MAS' warehouse was public at the time of the alleged disclosure." (ECF No. 83, PageID.1964.) In fact, the screenshots fall well short of establishing that much of the AR/MAS Plan, if anything, was generally known. Again, at most, the screenshots amount to a scintilla of evidence, which is not enough to withstand summary judgment. And, to the extent MM relies on screenshots of the 2024 MAS website, such information, even if publicized widely, existed well after the alleged breach, so does not have any evidentiary relevance in this part of the analysis (though it will in the next section regarding certain exclusions). For the foregoing reasons, the Court finds that there is no genuine issue of material fact as to whether the suitability of the MAS warehouse for the JL Program was generally known: it was not. Accordingly, the Court finds that there is no genuine issue of material fact that AR disclosed Confidential Information when it disclosed the AR/MAS Plan.

**B. Applicability of Exclusions**

The Court now turns its attention to whether any of the exclusions apply. In relevant part, the NDA provides:

> The obligations of the Receiving Party with respect to the Confidential Information do not apply to information which (a) the Receiving Party can document in written records as having been rightfully in its possession prior to the disclosure by the Disclosing Party or (b) after disclosure by the Disclosing Party to the Receiving Party, is published or otherwise becomes part of the public domain or generally available to the public through no fault or breach of the Receiving Party or (c) was supplied to the Receiving Party by a third party who is under no obligation to the Receiving Party to maintain such information in confidence or (d) was developed by or for the Receiving Party independently of a disclosure made under this Agreement. The Receiving Party agrees that it has the burden to prove that information falls within these exclusions.

(ECF No. 12-1, §2.3.) According to MM, all four exclusions apply. AR fully disagrees. The Court explores whether any exclusions apply, or more precisely, whether there is a genuine issue of material fact as to whether any of them apply. *See Organic Chem. Site PRP Grp. v. Total Petroleum*, 58 F. Supp. 2d 755, 763-64 (W.D. Mich. 1999) (denying summary judgment based on the petroleum exclusion where there were issues of fact concerning the presence of hazardous substances in the soil). In accordance with the NDA, the Court places the burden on MM to show that these exclusions do not apply, while taking care to draw all reasonable inferences in MM's favor as required on summary judgment.

As to the first exclusion, the Court finds that there is a genuine dispute of material fact as to whether MM rightfully had information concerning the suitability of the MAS facility for the JL Program prior to AR's disclosure. MM

argues it already "knew of MAS" because "it toured the facility in 2015, four years before any alleged disclosure by [AR]" when it went to examine the MAS facility for a potential purchase of the site. (ECF No. 83, PageID.1958.) "During the tour," MM claims, "[MM] prepared a detailed facility report with all of the characteristics allegedly disclosed by [AR], and more." (*Id*. (citing ECF No. 78-21, PageID.1628) (referencing the MM 2015 Report).)

While such a report may not, standing alone, be sufficient to create a genuine issue of fact as to whether the suitability of the MAS facility for the JL Program was generally known, it is certainly sufficient to do so with respect to this exclusion. After all, the MM 2015 Report was generated for purposes of sale, not just one program. Moreover, unlike the screenshots of the MAS webpages throughout time, there may also be corresponding testimony from those who visited the facility in 2015, such as Frederico Garcia and Hector Trevino, two of the individuals who prepared the MM 2015 Report, who can provide insights as to what information MM cultivated from this tour. (ECF No. 78-18, PageID.1587-88); (ECF No. 78-21, PageID.1628.)

Beyond that, the parties fail to brief in detail the (meaningful) differences between the MM 2015 Report and the AR/MAS Plan, a problem complicated by the fact that the former is far too technical for the Court to consider on its own. (ECF No. 78-21, PageID.1629-1632) (discussing, for instance, that there is a

"substation with 2 transformers 10/12.5/14 MVA for a total 28MVA, 69 – 13.2KV.") The parties also fail to go into detail as to whether (or to what extent) the pricing information that AR disclosed to MM on May 5, 2019 was rightfully in MM's possession, be it because of the 2015 MM Report or otherwise. (ECF No. 76-11, PageID.1245.) As such, the Court cannot weigh in on matters that might otherwise be dispositive here other than to say that these matters are best resolved by a jury at this juncture.

Further supporting this conclusion, the record shows that the parties planned a conference call in May 2019 to discuss Plan B, which was intended to include a discussion of the AR/MAS Plan and the suitability of the MAS facility for the JL Program. (ECF No. 78-11.) Any analysis regarding those topics that AR verbally disclosed in that call would, under the terms of the NDA, also *likely* qualify as Confidential Information, thereby creating even more evidentiary issues relative to the extent of the overlap with the MM 2015 Report. Briefing deficiencies and technical concerns also make it difficult to appreciate the significance and relevance of the list of assets of the MAS facility that MM purportedly received following the 2015 tour. (ECF No. 78-20.) Indeed, it is unfortunate that the parties do little to help the Court unpack the key evidentiary and legal details at play here. Notwithstanding these technical concerns and briefing deficiencies, considering all this evidence together—from the 2015 MM Report to the potential for testimony

related thereto to the list of MAS assets that MM received—the Court finds that a genuine issue of material fact exists as to this exclusion when taking all reasonable inferences in MM's favor. Said differently, to borrow from the Court's earlier analysis regarding the whole being greater than the sum of the parts: the collection of such evidence, despite the flaws of each individual piece of evidence, warrants a finding that there is a genuine issue of material fact.

The Court finds that there is a genuine issue of material fact as to the second exclusion as well. On the surface, it might seem unnecessary for the Court to exert any additional judicial resources on this exclusion, as the Court has already walked through the evidence creating a dispute of material fact as to whether it was generally known that the MAS warehouse was suitable for the JL Program at the time of the NDA. But, of course, the second exclusion exists for information that *became* public after AR's disclosure, limiting the universe of relevant evidence for this analysis. With that in mind, the Court outright rejects Defendants' arguments in this section to the extent they rely on evidence before or at the time of disclosure. (ECF No. 83, PageID.1964.)

The only appropriate pieces of evidence to which MM cites, then, are the screenshots of the 2024 MAS website. These screenshots appear to contain considerably more detail than the bare bones provided by 2011, 2012, and 2015 website screenshots. *Compare* (ECF No. 83-7, PageID.1997-2004 *with* ECF No.

83-7, PageID.2005-09.) To that point, parts of the 2024 website showcase similar photos, such as images of the six loading docks, to those contained in the AR/MAS Plan. *Compare* (ECF No. 83-7, PageID.2009) *with* (ECF No. 76-9, PageID.1221.) Therefore, unlike the screenshots from earlier years which, year after year, were bare bones,[5] the 2024 website screenshots warrant a reasonable inference that, if the Court were to peruse the rest of the website or otherwise receive the remaining webpages, there may be more information that was made public that overlaps with the AR/MAS Plan and otherwise, the suitability of the MAS facility for the JL Program. And, again, to the extent that there may be additional testimony relating to the conference call discussing the AR/MAS Plan, the extent of the overlap with the 2024 website becomes that much more unclear, rendering a jury the best mechanism for its resolution. For these reasons, the Court finds that there is a genuine issue of material fact as to the second exclusion.

The Court now turns to the third exclusion. Even assuming arguendo NS owed a duty of confidentiality so as to trigger the exclusion, there is no genuine issue of material fact here. The facts do not show, as MM contends, "that NS independently provided all information which [AR] claims is confidential." (ECF No. 83, PageID.1965.) NS may have provided the contact information for MAS in

[5]The Court notes that it did use the Wayback Machine (using the links the parties provided to the Court) to navigate the 2011, 2012, and 2015 websites, and, in each instance, the tab concerning "CAPABILITIES" was blank (except for the word itself) and the rest of the pages, such as the "ABOUT US" section, furnished no information remotely bearing on this case.

the summer of 2019, but the facts do not bear out, as MM suggests, that NS "identified [MAS]" as a suitable location for the JL Program. (*Id.*) Rather, they show that AR reached out in May 2019 to NS, at MM's request, for NS' opinion regarding the suitability of the MAS facility for the JL Program, thereby alerting NS to the opportunity. *See supra* Section II.F; (*accord* ECF No. 76-17, PageID.1278.) For this reason, the Court is not convinced a reasonable jury would credit the narrative that NS independently arrived at the idea that the MAS facility could serve as a suitable location for the JL Program. As such, the Court finds that there is no genuine issue of material fact as to whether the third exclusion applies: it does not.

As to the fourth exclusion, there exists a genuine issue of material fact as to whether MM independently developed information revealing the MAS facility is suitable for the JL Program. The reality is that the Court has already determined that MM's 2015 tour creates a triable issue of fact as to whether MM rightfully possessed the information beforehand, an analysis that is wholly transferable to this exclusion. The briefing deficiencies and technical concerns are also transferable. As such, the Court need not weigh in on the parties' dispute as to whether the information MM gained from its August 1, 2019 tour of the MAS facility can create a triable issue of fact. (ECF No. 83, PageID.1965-66); (ECF No. 86, PageID.2377-78.) However, it will to narrow matters further for the parties.

The Court does not believe that a reasonable jury would credit the idea that MM independently developed this Confidential Information by subsequently touring the same facility just three months after AR tipped them off, particularly where their own internal emails acknowledge that very fact. (ECF No. 76-13, PageID.1260 (in Ms. Jasso's email, dated August 1, 2019, she revisits the idea of the MAS facility, noting that it was "an option that [AR] considered 3 months ago").) Such an argument falls flat on its head.

**C. Was Confidential Information Used?**

The Court now turns to the question of whether MM "used" the Confidential Information at issue here in violation of the NDA. Notably, unlike with the exclusions, the NDA places no burden of proof on MM to show that the information was used, so the Court assumes it is AR's responsibility. (ECF No. 12.); *see Marino v. Grayhaven Est. Ltd.*, No. 271118, 2007 WL 2891599, at *2 (Mich. Ct. App. Oct. 4, 2007) (citing *Wayne County v. Wayne Cnty. Ret. Com'n*, 704 N.W.2d 117, 127 (2005)) (explaining the general contract interpretation principle of *expressio unius est exclusio alterius*—the express mention of one thing implies the exclusion of another.)

Before it reaches the question of whether there is a genuine issue of material fact on this issue, the Court must first clarify the meaning of the term "used," as MM has called the legal meaning of the term into question. (ECF No. 83,

PageID.1959.) In this case, the Court is saved some time in its analysis because it has the benefit of the Michigan Court of Appeals' interpretation on this very term: "use," according to the Random House dictionary, means "to employ for some purpose," and, in Black's Law Dictionary, refers to "the application or employment of something." *Aroma Wines & Equip., Inc. v. Columbian Distrib. Servs., Inc.*, 844 N.W.2d 727, 731 (Mich. Ct. App. 2013), *aff'd*, 871 N.W.2d 136 (Mich. 2015) (internal quotation marks and citations omitted). The Court also has the benefit of this term's usage in virtually identical circumstances, as the Honorable Judge Mark Goldsmith, another judge in this District, recently encountered this very same argument. *See FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 209 (E.D. Mich. 2020.)

In *Bullock*, Judge Goldsmith construed the term "use" in the parties' nondisclosure agreement as requiring "an application or employment of . . . the confidential information for some purpose." *Id*. In support of this interpretation, he stressed that it is "consistent with the express terms" of the parties' nondisclosure agreement, "which authorizes the use" the confidential information "solely for the purposes of the defense of California warranty actions against [plaintiff]." *Id*. (underline in the original). As such, he reasoned, it cannot be said that "copying confidential files" constitutes a "use" as "it does not involve an 'application' or employment' of those files for any concrete purpose," and,

therefore, does not constitute a breach of the nondisclosure agreement. *Id*. Shaped by these cases, the Court begins its analysis of whether MM "used" Confidential Information in violation of the NDA.

To do so, it starts with the relevant portion of the NDA, namely the following:

> The Receiving Party agrees . . . (b) to use the Confidential Information solely for the Disclosure Purpose or as otherwise expressly authorized by the Disclosing Party and (c) not to make any other use of the Confidential Information for its own benefit at any time in the future, and not to knowingly permit or facilitate such use by any other person or entities except as set forth in this Agreement, without the prior written consent of the Disclosing Party.

(ECF No. 12-1, §2.2.) Like in *Bullock*, the express terms of this NDA support the interpretation that the term "use" involve some sort of application. As shown above, the Receiving Party may not use Confidential Information *for its own benefit* and it must also use Confidential Information *solely for the Disclosure Purpose.* But unlike *Bullock*, the disputed facts concern whether MM used the Confidential Information—that the MAS' facility was suitable for the JL Program—for a concrete purpose: to begin negotiations and, ultimately, consummate a deal with MAS for its warehouse and material handling services for the JL Program. Thus, the analysis does not resolve as a matter of law, as it did in

*Bullock*. Instead, the Court must now decide whether there is a genuine issue of material fact in this regard.

For reasons already given, the Court finds that there is a genuine issue of material fact in this respect. For instance, the Court has already determined that there remains a genuine issue of material fact as to whether MM rightfully knew about the suitability of the MAS facility for the JL Program prior to AR's disclosure of the same. By extension, the Court must leave it for a jury to decide whether MM used Confidential Information or if, for instance, it used information that it already had rightfully in its possession to begin negotiations and, ultimately, consummate a deal with MAS for its warehouse and material handling services for the JL Program.

**III. Damages**

The final part of the analysis is whether AR has a made a showing of damages for the alleged breach for summary judgment purposes. However, AR's only reference to damages occurs in its introduction to its opening brief in which it charges that "[MM's violation of the [NDA] has resulted in significant and ongoing damages to [AR]." (ECF No. 76, PageID.1104.) Its reply brief does not address damages at all. (ECF No. 86). Therefore, the Court considers AR's argument on damages waived *for purposes of the Court's analysis of AR's motion for partial summary judgment*. *Golden*, 548 F.3d at 493 (6th Cir. 2008) (citation omitted).

Accordingly, regardless of the Court's analysis in the prior two sections regarding whether there was a contract or breach, the failure to brief this issue creates an independent basis to deny AR's motion for partial summary judgment. In sum, therefore, there are two independent bases supporting the Court's denial of AR's motion for partial summary judgment: the first is that there is a genuine issue of material fact as to whether there was a breach and the second is that AR waived its argument regarding damages.

However, as just suggested by the Court's use of italics, for reasons that will be explained later, AR will not ultimately be precluded from presenting its theory of damages to a jury.

## IV. Applicable Law and Analysis – MM's Motion for SMJ

MM moves for summary judgment on all three counts. Because MM also moves for summary judgment on the breach of contract claim, the Court has an obligation to take up an independent inquiry into this claim, as cross-summary judgment motions do not, for reasons stated earlier, affect the standard of review. In other words, the Court must now draw all reasonable inferences in favor of the non-moving party, which is now AR. However, to the extent there are issues of law that repeat between the parties' summary judgment motions, the Court does not believe it necessary to repeat its analysis and will note those instances where applicable. Even on issues of fact, the Court's analysis may not be as detailed as

before to the extent that the Court has already addressed much of the substance of the parties' arguments. With that understanding, the Court starts its analysis with the breach of contract claim before turning to the claims of tortious interference and civil conspiracy.

## I. Breach of Contract Claim against MM

As noted earlier, a breach of contract claim requires: a contract, a breach, and damages. As a matter of law, for reasons already given, the NDA is a contract. *See supra* Section III.A.I.

### A. Whether There Was a Breach Is for the Jury

For the reasons that follow, the Court finds there is a triable issue of fact as to whether a breach occurred. The Court briefly addresses the issue of whether the information in dispute qualifies as Confidential Information before turning to the four exclusions. Unlike before, the Court does not address the question of whether Confidential Information was used because MM does not present it as an issue in its opening brief or reply brief for summary judgment (though it does rear its head in the damages section). As such, the Court simply turns to the issue of damages, which is fully briefed this time, before proceeding to the next motion before the Court today.

#### I. Was Confidential Information Disclosed?

For reasons explained earlier, the information AR disclosed, as detailed earlier, was, as a matter of law, the property or business of AR. *See supra* Section III.A.II.A. This conclusion is unaffected by MM's argument in its own motion (which it does not raise in its opposition brief to AR's motion): that MM was the one that provided the logistics plan, not AR—an argument predicated on MM's submission of the RFQ to AR. (ECF No. 78, PageID.1457 (citing ECF No.78-6.) This argument misses the point. Even if MM is correct, AR had to develop a plan to respond to MM's logistic plan, and that plan—the AR/MAS Plan—disclosed the Confidential Information at issue here. Having already rejected MM's other arguments on whether the information disclosed was the property or business of AR, the Court does not revisit this question further. *See supra* Section III.A.II.A. Similarly, the Court already determined that there was no triable issue of fact as to whether that information was generally known—a conclusion that the Court reached even when it was drawing all inferences in favor of MM. *See supra id*. As such, the Court does not repeat that analysis here where MM is the movant and the inferences must be drawn the other way.

**II. Applicability of Exclusions**

Accordingly, the Court turns its focus to each of the four exclusions, although, again, its analysis may not be as detailed as before. Starting with the first exclusion, the Court finds that there is a genuine issue of material fact as to

whether MM rightfully possessed the Confidential Information at issue prior to AR's disclosure. While a reasonable jury may find the 2015 MM Report (and any related testimony) discloses that the MAS facility is a suitable location for the JL Program, it is also equally possible that they may not. Indeed, as the Court discussed earlier, there are many briefing and technical concerns surrounding this evidence underlying this issue that make it difficult for the Court to evaluate this issue; however, as also noted, under the circumstances, it is nonetheless appropriate for this claim to proceed. *See infra* Section III.A.II.B. For all these reasons, when drawing all inferences in AR's favor, the Court finds that there is genuine issue of material fact as to the first exclusion.

As to the second exclusion, the Court also finds that there is a genuine issue of material fact as to whether the Confidential Information at issue was publicly available before the alleged disclosure. As explained earlier, the screenshots for the 2024 website for MAS, as MM correctly points out, present a lot of key details regarding the MAS warehouse, some of which appear to overlap with those contained in the AR/MAS Plan. *See infra id*. However, taking all inferences in AR's favor, a reasonable jury could decide that the information on the website falls short of communicating that the MAS facility is suitable for purposes of the JL Program. Thus, the Court finds that there is a genuine issue of material fact as to the second exclusion.

As to the third exclusion, the Court simply adopts its earlier reasoning that, even when taking all inferences in MM's favor, which is not even the standard here, there is no genuine dispute of material fact that the third exclusion is inapplicable. *See infra id.*

Finally, the Court turns to whether there is a genuine issue of material fact as to the fourth exclusion regarding whether MM independently developed the Confidential Information at issue. The reality is that the Court has already determined that the 2015 MM Report (and any testimony therewith) creates a triable issue of fact as to whether MM rightfully possessed this Confidential Information beforehand, an analysis that is wholly transferable to this exception. The briefing deficiencies and technical concerns noted therewith are also transferable. As such, the Court finds that there is a genuine issue of material fact as to this exclusion.

**III. Whether There Were Damages Is for the Jury**

MM advances two reasons why AR is not entitled to damages. The first may sound familiar: MM never used the information AR disclosed to it. (ECF No. 78, PageID.1463.) The Court already addressed the issue of usage before, finding that there was a genuine issue of material fact, even when drawing all inferences in MM's favor. *See infra* Section III.A.II.C. The Court, therefore, rejects this argument now where MM is the movant and the inferences go the other way.

MM's second argument fares no better. To understand MM's argument, the Court provides the relevant portion of the NDA:

> **<u>Interpretation</u>**
>
> Nothing in this Agreement imposes any obligation on either Party (or either Party's Affiliate) to consummate a transaction or to enter into or continue any discussion or negotiations regarding a transaction, or to provide additional Confidential Information. No contract or agreement relating to any transaction shall exist or be deemed to exist unless and until a definitive written contract setting forth all of the terms and conditions of such a transaction has been executed and delivered, and become binding upon, each of the Parties hereto.

(ECF No. 12-1, § 5.) According to MM, because of this clause, it follows that "AR can claim no damages, lost profits or otherwise, based on a frame sequencing storage contract it did not get." (ECF No. 78, PageID.1462.) Not so. In the very next section, the parties agree to the exact opposite:

> **<u>Legal and Equitable Remedies</u>**
>
> The Parties acknowledge that due to the unique nature of the Confidential Information, a breach by the Receiving Party or by an Affiliate Receiver of any of the covenants and restrictions set forth in this Agreement would cause incalculable and irreparable harm to the Disclosing Party or to the Affiliate Discloser and that damages would not, in and of themselves, be an adequate remedy. The Parties therefore agree that, in the event of a breach of any of the provisions of this Agreement by the Receiving Party or by the Affiliate Receiver, the Disclosing Party shall have the right to enforce this Agreement and any of its provisions by seeking an *injunction*, *without prejudice to any other*

> *rights of remedies the Disclosing Party may have for a breach of this Agreement. . . . .*

(ECF No. 12-1, § 6 (emphasis added).)

And, given that "the proper measure of damages of a nondisclosure agreement is . . . 'compensatory damages for what [the plaintiff] lost or the value of what has been misappropriated,'" AR's expert report on damages creates a genuine issue of material fact in this regard. *Ford Motor Co. v. Intermotive,* No. 4:17-CV-11584-TGB-APP, 2023 WL 1423980, at *3 (E.D. Mich. Jan. 31, 2023); (ECF No. 88 (the expert suggests that, if MM had retained AR for a services contract, AR would have been entitled to a fee amounting to over $5,000,000)). So too does Mr. Jacobs' assertion that, but for MM's gamesmanship, AR "would have closed this deal, plain and simple." (ECF No. 76-2, PageID.1149.) As such, it is erroneous for MM to suggest that the only possible loss "was the value of the information it allegedly developed related to MAS facility," which Mr. Jacobs had not yet quantified at the time of his deposition. (ECF No. 78, PageID.1463) (citing 174:18-175:8.) In other words, the question of damages is a matter best for the jury in this case, a conclusion supported by caselaw. *See McManamon v. Redford Twp.*, 730 N.W.2d 757, 763-64 (Mich. Ct. App. 2006) (noting that damages are generally for the jury to decide).

## II. Tortious Interference and Civil Conspiracy Claims

The Court now addresses the tortious interference with a contract claim against MSP before turning to the civil conspiracy claim against both Defendants. In Michigan, the elements of tortious interference with a contract include: "(1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship; and (4) resulting damage to the plaintiff." *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286–87 (6th Cir. 2010) (citing *Via the Web Designs, L.L.C. v. Beauticontrol Cosmetics, Inc.*, 148 F. App'x 483, 487 (6th Cir. 2005)); *see also Badiee v. Brighton Area Schs.*, 695 N.W.2d 521, 538 (Mich. Ct. App. 2005) (quoting *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 597 (Mich. Ct. App. 2003)). However, as MSP correctly notes, it is impossible as a matter of law, for the reasons explained below, for MSP to interfere with the NDA.

In relevant part, Michigan law requires that AR establish that the defendant is a "third party to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent." *Lawsuit Fin., LLC v. Curry*, 683 N.W.2d 233, 241 (Mich. Ct. App. 2004) (citing *Reed v. Mich. Metro Girl Scout Council*, 506, N.W.2d 231, 233 (Mich. Ct. App. 1993)). Because of this rule, a "corporate agent is not liable for tortious interference with the corporation's

contract unless the agent acted purely for personal gain and with no benefit to the corporation." *Willis v. New World Van Lines*, 123 F. Supp. 2d 380, 397 (E.D. Mich. Nov. 2, 2000) (citing *Murphy v. Birchtree Dental, P.C.*, 964 F. Supp. 245, 250 (E.D. Mich. 1997) and *Canderm Pharmacal, Ltd. v. Elder Pharm.*, 862 F.2d 597, 601 (6th Cir. 1988)); *Reed*, 506 N.W.2d at 13 (citing *Dzierwa v. Mich. Oil Co.*, 393 N.W.2d 610, 613 (Mich. Ct. App. 1986)).

In this case, it could not be clearer that this issue disposes of this tort claim. After all, there is but one theory of the facts here (which inextricably tie the tortious interference and civil conspiracy claims together): that MM and MSP, which, again, both parties agree is an affiliate of MM for NDA purposes and otherwise, "conspired together through an intentional agreement" to "obtain and improperly unlawfully utilize [AR's] confidential information," resulting "in *their* use of the storage facility that [AR] proposed." (ECF No. 12-1, PageID.85) (emphasis added); (ECF No. 84, PageID.2103 (alleging that Rusty Schlemer, an MSP employee, "actively facilitated the use of that information to the detriment of [AR]"). Indeed, in light of the foregoing, it is apparent that MSP aided MM to achieve this mutually beneficial result—quite the opposite of what AR needs to prove to proceed with a tortious inference claim. AR's response brief spills much ink analyzing the legal contours of the third element (if one is to use the numbering the Court earlier provided) of a tortious interference claim, all the while ignoring

that this issue is dispositive. Considering these allegations, it is plainly apparent that MSP is not a third-party, but an agent of MM.

As such, AR's claim for tortious interference with a contract fails as a matter of law, and, not surprisingly, so does AR's claim for civil conspiracy, as there is no other tort claim alleged in this case. *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003) (noting "a claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable tort" (quoting *Early Detection Ctr., P.C. v. New York Life Ins. Co*., 403 N.W.2d 830, 836 (Mich. Ct. App. 1986)). Accordingly, the Court grants summary judgment to MSP as to this tort claim, and as to both Defendants, grants them summary judgment with respect to the civil conspiracy charges.

## V. Applicable Law and Analysis – Sanctions

In light of the requirements that the Court earlier set forth, *see supra* Section I.A, the Court must answer the following questions before assessing which remedies might be appropriate under Rule 37(e)(1):

> First, was there a duty to preserve the data in issue? If not, the analysis ends. Second, were reasonable steps taken to avoid the loss of the data? If so, the analysis ends. Third, can the lost data be "restored or replaced" through additional discovery? If so, the analysis ends. Fourth, was the other party prejudiced by the loss of the data? If not, the analysis ends, but if there was prejudice, the court can impose "measures no greater than necessary to cure the prejudice."

*Yoe*, 2017 WL 5479932, at *9. The Court is asked to address the emails of Dennise de la Fuente Garza (not to be confused with Sergio Garza, as AR occasionally is in its brief), and Rusty Schlemer that were supposedly lost as a result of Defendants' automatic deletion policy, which they do not provide a copy of, that activates, for former employees, 90 days after their separation.

The Court starts with the question of the duty to preserve. Rule 37(e) regarding electronically stored information does not create a duty to preserve evidence; instead, it is based on the common-law duty to preserve. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. "It is beyond question that a party to civil litigation has a duty to preserve relevant information, including [electronically stored information], when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" *Buddenberg v. Est. of Weisdack*, 711 F. Supp. 3d 712, 818 (N.D. Ohio 2024) (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008)). "Any number of events put a party on notice of a duty to preserve: demand letters, hold notices, preservation requests, litigation threats, or a party's own decision to pursue a claim." *Id*. (quoting *Gomez v. Metro. Gov't of Nash. & Davidson Cnty*., No. 3:19-cv-00026, 2021 WL 3406687, at *2 (M.D. Tenn. Aug. 4, 2021)). E-mails qualify as electronically stored information. *See Waskul v. Washtenaw Cnty. Cmty.*

*Mental Health*, 569 F. Supp. 3d 626, 634 (E.D. Mich. 2021) (citing *Zubulake v. UBS Warburg, LLC*, 217 F.R.D. 309, 320 (S.D.N.Y. 2003)).

The Court starts its duty to preserve analysis by noting that Defendants' emails in question were previously part of a motion to compel, filed in September 2023, which the Court later granted. (ECF No. 57, PageID.633.) In its decision, the Court determined that "Defendants do not dispute that the documents sought are relevant." (ECF No. 62, PageID.936.) With sanctions now on the table, however, Defendants argue that neither de la Fuente nor Schlemer were part of Defendants' search team nor played any role in the alleged misuse of AR's information. (ECF No. 80, PageID.1728.) Defendants are in no position to so suggest. There is testimony that Schlemer served as the "guru" and "expert" and was involved in "everything," having "coordinated the whole program" related to the JL Program search. (ECF No. 82-1, PageID.1906.) Meanwhile, there is an email exchange between MM and Plante Moran regarding MM's search for a suitable facility in which Garza was carbon copied as well as testimony from Sergio Garza, another employee of Defendants, who identifies de la Fuente as Ms. Jasso's boss who became "more involved" in the search as the September deadline approached. (ECF No. 77-5, PageID.1346.) That such excerpts do not conclusively "prove" their "importance to this case" is not, as explained earlier, the

barometer for whether evidence requires preservation. (ECF No. 80, PageID.1729.)

Defendants' last argument as to why they did not have an obligation to preserve these emails fares no better: even assuming the parties stipulated that there would be no need for ESI protocol—an assertion for which Defendants provide no citation in the record—that does not eliminate the parties' obligations under the Federal Rules of Civil Procedure. *Cf. Raine Grp., LLC v. Reign Cap.*, No. 21-CV-1898 (JPC) (KHP), 2022 WL 538336, at * 1 (S.D.N.Y. Feb. 22, 2022) ("[A]n ESI protocol and search terms work in tandem with the parties' obligations under the Federal Rules and do not replace a party's independent obligation to produce electronic (or paper) documents that are reasonably accessible, relevant, and responsive within the meaning of Rule 34."). For all these reasons, there was a duty to preserve. Notably, Defendants do not oppose AR's contention that de la Fuente's and Schlemer's emails were automatically deleted *after the lawsuit was filed*, so the Court treats the requirement that the ESI was lost after the duty to preserve was in effect as also satisfied.

As such, the Court turns to the question of whether reasonable steps were taken. MM's argument here is that de la Fuente was not identified on either parties' initial disclosures or witness list and Plaintiff did not request discovery

regarding her until September 15, 2023—after the close of discovery. (ECF No. 80, PageID.1732.) This argument is not persuasive.

As AR notes, MM cites no authority suggesting that the duty to preserve depends on initial disclosures or witness lists, and the Court need not repeat its analysis in that regard. Moreover, according to Defendants' own timeline, Schlemer's emails (following his retirement on June 28, 2020) were available until late September 2020 at which time the Defendants' automatic deletion process kicked in. In other words, Defendants failed to override their automatic system (assuming one even exists) despite having nearly 60 days after the lawsuit was filed to do so and approximately six months since AR sent a demand letter to do so. As to de la Fuente, she did not separate from MM until December 2023, meaning that her emails were available for several years following the commencement of this lawsuit prior to their automatic deletion. More concerningly, her emails were deleted (following her retirement in January 2024) while the aforementioned motion to compel her emails (and others, including Schlemer) was pending. (ECF No. 57 (the motion to compel, dated September 15, 2023); ECF No. 80, PageID.1733 (noting that March 2024 was 3 months after de la Fuente retired); ECF No. 62 (the order granting Plaintiff's motion to compel, dated March 5, 2024).) "Faced with a situation crying out for preservation," Defendants did nothing and doing nothing is not reasonable. *Bruin v. Swank*, No. 5:16-CV-105-

BJB, 2025 WL 289679, at *8 (W.D. Ky. Jan. 24, 2025) (citing *Bistrian v. Levi*, 448 F. Supp. 3d 454, 475 (E.D. Pa. 2020) and *Johns v. Gwin*, 503 F. Supp. 3d 452, 468-70 (W.D. Va. 2020)).

The Court now turns to whether the emails can be restored or reproduced. According to Defendants, they "were unable to produce custodial emails" for de la Fuente but suggest that "any relevant emails on which she was included or copied would have been among the nearly 2,000 emails produced by key custodians," rendering it "likely" that all her emails were produced. (ECF No. 80, PageID.1729.) As to Schlemer, Defendants note his "custodial emails were not retrievable," though they were able to produce "at least 39 emails" that "he authored. (*Id.*) Under these circumstances, because *not all the records* have been restored or replaced, the Court is satisfied that this element is met for the purposes of sanctions. *See Jonathan R. v. Justice*, No. 3:19-cv-00710, 2024 WL 1339522, at *7 (S.D.W.V. Mar. 28, 2024) (treating the fourth element for Rule 37 sanctions as satisfied where plaintiffs demonstrated that "all of the records have not been restored or recovered by others means" (citing *In re Ethicon, Inc.*, No. 2:12-CV-00497, 2016 WL 5869448, at *3 (S.D.W. Va. Oct. 6, 2016) and *Gov't Emps. Health Ass'n v. Actelion Pharms., Ltd.*, 343 F.R.D. 474, 486 (D. Md. 2023))). However, as demonstrated by the relief the Court will grant at the end of this opinion, the Court is not convinced, based on the record, that the messages are assuredly irretrievable.

(*See* ECF No. 80, PageID.1729 (noting that Defendants only asked a "key assistant" of Schlemer to perform a search for any emails Schlemer may have sent him, a request that resulted in just 39 emails and not explaining what measures they took with regard to de la Fuente).)

That leaves the final question regarding prejudice. According to AR, Garza's emails are "critical" for AR to obtain evidence regarding Defendants' "candid and contemporaneous assessment of [AR's] confidential information" and "the decision to go behind [AR] and move forward with [MAS]." (ECF No. 77, PageID.1297.) Assumedly, the same prejudice exists as far as the omission of Schlemer's emails, though AR's briefing fails to expressly state as much.

However, for the following reasons, the Court finds that the loss of these employees' emails is not prejudicial. First, by this point in its opinion, the Court has already determined that there is no genuine issue of fact in terms of whether AR/MAS Plan constitutes Confidential Information under the NDA. Moreover, as Defendants point out, as a general matter, aside from concerns around general knowledge in this case, the determination of what constitutes Confidential Information remains an issue of law for which no facts are required or appropriate, including employees' subjective views regarding the confidentiality of the items disclosed. To the extent that genuine issues of fact do exist as to exclusions, the Court has, for reasons the Court has repeatedly given, determined that the tour(s)

of the MAS facility that MM went on following AR's disclosure in April 2019 cannot serve as an evidentiary basis for any of the exceptions. In other words, the remaining dispositive issues turn on whether the 2024 website that MAS publicized or the materials MM collected in connection with its 2015 tour of the MAS facility reveal the same content as that disclosed by AR, namely, that MAS' Maumee location was a suitable facility for the JL program. As such, it does not appear to the Court that, at this juncture, there is a significant need to obtain evidence regarding "Metalsa's decision to go behind [AR] and move forward with [MAS]." (ECF No. 77, PageID.1297.)

More to the point, AR already has evidence speaking to MM's "candid and contemporaneous assessment" of the information. AR knows this because it references it in their motion for partial summary judgment. (ECF No. 76, PageID.1117 (citing ECF No. 76-3, PageID.1155); *Id*., PageID.1118 (citing ECF No. 76-5, PageID.1173.) In addition, there is Ms. Jasso's testimony that:

> After [AR] killed th[e] [MAS facility] option because they were the ones that said that [it was] no longer available, there was nothing confidential because we weren't working with that option.

(ECF No. 78-5, PageID.1505.) Further, in Ms. Jasso's emails with her team, she acknowledges that the MAS idea originally came from AR. (ECF No. 76-12, PageID.1260.) And, in fact, one of Schlemer's emails that was retrieved includes a similar acknowledgment. (ECF No. 84, PageID.2090 (citing ECF No. 84-4,

PageID.2135-36). Thus, to the extent further emails like this once existed, the Court would characterize them as cumulative.

Finally, it bears noting that the Court searched *all* the summary judgment briefs, both in connection to AR's motion and Defendants' motion, for Dennise de la Fuente Garza's name and its search returned no results. (While the name Garza did appear, it was only in connection with Sergio Garza). As to Schlemer, the Court did the same; his name appeared with more regularity, but not in a way that changes the analysis. To the extent he is referenced, he only appears regarding matters that have otherwise been resolved as a matter of law. *See, e.g.*, ECF No. 84, PageID.1085 (AR's argument that "[t]he failure to preserve the emails of Rusty Schlemer further demonstrates Defendants' malicious intent" in the tortious interference context, a claim which the Court dismissed as a matter of law for reasons other than intent). Accordingly, sanctions under Rule 37(e)(1) are inappropriate.

Of course, under Rule 37(e)(2), there is no requirement that the Court find prejudice before imposing sanctions. *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 773 (E.D. Mich. 2019) (quoting advisory committee notes to Rule 37(e)(2)). Instead, under this subrule, the party seeking sanctions must establish that the defendants "acted with the intent to deprive another party of the information's use in the litigation." *Drips Holdings, LLC v. Teledrip*, No. 5:19-cv-

2789, 2022 WL 4545233, at *1 (N.D. Ohio Sept. 29, 2022). "This culpable state of mind requires more than a showing of negligence or gross negligence." *Id*. (citing *Applebaum v. Target Corp*., 831 F.3d 740, 746 (6th Cir. 2016)). Courts may infer this intent from the parties' actions. *Id*. (citing *Culhane*, 364 F. Supp. 3d at 774). Courts should consider the timing of the deletion of the data and change in the retention policy (if any) and whether there is a credible explanation for the failure to preserve the data. *Id*. (citing same). Even if the Court finds an intent to deprive, the court is not required "to adopt any of the measures listed in subdivision (e)(2)." *Culhane*, 364 F. Supp. 3d at 733.

In this case, the timing of the deletion unquestionably demonstrates more than gross negligence. It is beyond this Court's understanding how Defendants, particularly as sophisticated corporate litigants, can allow de la Fuente's data to be deleted while a motion to compel is pending on those very emails. Nor can it understand how Defendants can come back to the Court to subsequently dispute the importance of her emails (and Schlemer's emails) after losing that motion. Similarly, allowing Schlemer's emails, particularly given his role at the company, to, in the most generous rendition of events, fall to the wayside despite having more than 6 months (if using the demand letter as the reference point) to override its automatic policy, for which there is no evidence of its existence, is likewise telling of the kind of deliberate absentmindedness and bad faith that other courts

have found warrant sanctions. *See Henry v. Mihm*, 827 F. Supp.3d 1002, 1017 (E.D. Mich. 2026) ("Whether the offending party 'affirmatively destroys the data, or passively allows it to be lost, is irrelevant; it is the [spoliator's] state of mind that logically supports' the imposition of Rule 37(e)(2) sanctions." (quoting *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018)).

As noted earlier, the Court need not adopt any of the measures listed in Rule 37(e)(2), including presumptions of unfavourability and adverse inferences, as remedies. While the Court does not rule out their adoption in the future, the Court finds it most appropriate at this juncture to require Defendants pay for a forensic analyst, as AR proposes, to attempt to recover those emails accounts.

The Court finds this result to be fair and appropriate in this case. For starters, "Rule 37(e)(2) reserves its *harshest sanctions* for instances in which 'the party [failing to take reasonable steps to preserve ESI] acted with the intent to deprive another party of the information's use in the litigation.'" *Resnick v. Coulson*, No. 17-CV-676 (PKC) (SMG), 2019 WL 2256762, at *13 (E.D.N.Y. Jan. 4, 2019) (citation omitted). And here, as just suggested, the Court declines to mete out any of the three harshest sanctions provided by the rule (which, as noted earlier, is a permissible choice). The Court elects this path as it is not entirely convinced that an adverse presumption or jury instruction is warranted at this time, as it remains unseen what these emails contain. More to the point, under the

current record, there is no reason to believe that the lost emails would prejudice AR in any way, reinforcing the Court's hesitation to impose such drastic sanctions. For these same reasons, the Court finds that striking affirmative defenses would be too severe, so rejects that portion of the relief that AR requests as well.

However, as to attorneys' fees, the Court will grant that portion of the relief requested. To that end, it will entertain supplemental briefing on the matter to understand the dollar amount sought and the legal reasonableness of that request but will defer ordering the parties to provide that information until after the forensic analysis is completed. In that regard, the Court will instead order the parties to submit a status update, within 90 days from the date of this Order, regarding the forensic analyst's findings.

While the Court is addressing the topic of sanctions, it bears noting that Defendants moved for Rule 11 sanctions against AR, burying their motion inside their opening brief for summary judgment. (ECF No. 78, PageID.1467-68.) The Local Rules strictly prohibit combining stand-alone documents and require that they be stricken. L.R. 7.1.i (as an example of this rule in action, the local rules provide that "a motion for preliminary injunctive relief must not be combined with a complaint"). As such, the Court strikes Defendants' motion for Rule 11 sanctions against AR.

## VI. Conclusion

AR's motion for partial summary judgment is denied. Defendants' motion for summary judgment is granted in part and denied in part: to the extent that the Defendants seek dismissal of Count One, the motion is denied; to the extent that they seek dismissal of Counts Three and Four, the motion is granted. AR's motion for Rule 37(e) sanctions is granted and denied in part, as described herein. Defendants' motion for Rule 11 sanctions is denied. AR's motion to strike is granted.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for partial summary judgment is **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART** in that the Court holds that Defendants are entitled to summary judgment with respect to Counts Three and Four but are not entitled to summary judgment as to Count One;

**IT IS FURTHER ORDERED** that Counts Three and Four are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for sanctions under Rule 37(e) is **GRANTED IN PART AND DENIED IN PART**; to the extent Plaintiff seeks affirmative defenses to be stricken, adverse inferences to be drawn,

or adverse jury instructions to be issued, the motion is **DENIED without prejudice**; to the extent Plaintiff seeks attorneys' fees on costs and expenses related to this motion and a forensic examination of Defendants' records at Defendants' expense, the motion is **GRANTED** on the terms described herein; Defendants are **ORDERED** to allow a third-party forensic imaging firm to attempt to recover the email accounts of Charles ("Rusty") Schlemer and Dennise de la Fuente Garza at Defendants' expense; the parties are to provide a status update within 90 days of this Order at which time the Court will provide further instruction, which, may if appropriate, include setting a briefing schedule for the supplemental briefing that is necessary to fully resolve Plaintiff's request for attorneys' fees in connection with this motion;

**IT IS FURTHER ORDERED** that Defendants' motion for sanctions under Rule 11 is **STRICKEN**; and

**IT IS FURTHER ORDERED** that Plaintiff's motion to strike is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 30, 2026